Case No.  3:20-cv-04058-MMC_____
DEFT Exhibit No. ____G_____
Date Admitted _____
Signature _____

**Memorandum:**

<u>To:</u> The Truman Scholarship Foundation

<u>CC:</u> Terry Babcock-Lumish and Tara Yglesias

<u>From:</u> Brendan Schultz

<u>Date:</u> July 11, 2019

<u>Topic:</u> Discrimination in Truman Scholarship Application Review

**Introduction:**

This memo provides an account of the discrimination I experienced interviewing for the 2019 Truman Scholarship. The first section describes my interview experience, outlining differential treatment and actions by panelists that are indicative of discrimination. The second section presents evidence of discrimination through a comparison of merits. The third section requests action moving forward.

**Interview Account:**

The Truman Foundation has previously stated that the interview panelists have trouble recalling my interview. Fortunately, I remember the interview clearly.

I was the second person to be interviewed from all finalists and the first candidate interviewed from California, the first interviewee being the only finalist from Hawaii. Once this candidate returned to the waiting room from the interview, the other finalists, sitting around a table, asked her how the interview was. Knowing I was next, she looked toward me and said the interview panelists were kind and I had nothing to worry about.

As I walked into the interview room, I looked at a row of stoic faces, and asked "how are you." No answer was given and Brooks Allen asked the first question before I sat in the chair. The question was "Why do you do work in Macedonia instead of the United States?" I responded

by explaining that the opportunities for me to undertake community development work in Macedonia existed and that the same opportunities in America did not. In response to this, Brooks Allen stated "That does not really provide a reasonable response to my question. Why do you do work in Macedonia instead of the United States?" Brooks Allen did not specify what was missing from my first response. I responded once again, giving further detail about the resources that had given me the opportunity to develop the first inter-ethnic youth development program in Macedonia. Then, Brooks Allen asked me for the third time "Why do you do work in Southeastern Europe instead of the United States?" I once again responded with the same argument, only expanding on my initial response. Brooks Allen only smirked.

Aside from the first three questions, the next few questions were benign. However, about halfway through the interview, the questions went from polite and inquisitive to demeaning and inappropriate. This started with a series of questions about the methods of my work in the Balkans from Kevin Higgins. As I answered each question, Kevin Higgins became more and more frustrated. Seeing his frustration after one of my responses, I asked Kevin Higgins if he was confused about a particular attribute of my work. Kevin Higgins responded with the following question, "Do you get on a plane, go to Macedonia, get off the plane, go through the airport, and say 'congratulations young people, you're empowered!'"

This frivolous question visibly upset a few of the other panelists, including Ruju Srivastava, who, clearly nervous in doing so, interrupted the beginning of my response to ask me a more respectful question, "You have lived with a few host families abroad. What have you learned through those experiences?" I first answered Srivastava's question by explaining how I learned cross-cultural diplomacy by interacting with my host family members.

I then answered Kevin Higgins's question by assertively stating that the first action I took when I stepped off the plane in Macedonia was listen. I listened to friends, host family members, young people, teachers, and NGO workers throughout the entire country. I then returned to Macedonia a year after I left and listened more. The eventual product of all of this listening is that I built a relationship network that enabled me to understand the nuances of inter-ethnic tension in the Balkans and provided me with the resources to organize a youth leadership development program on tolerance, inter-ethnic understanding, and human rights and develop a multi-national non-profit to ensure the program's sustainability.

Kevin Higgins did not appear to like my response. As Ruju Srivastava began to ask another question, Kevin Higgins, interrupted her and asked "Do you think that Jews are oppressed?" with me responding that persecution of Jews is empirically demonstrated and unquestionable. Kevin Higgins followed this with "Are Jews as oppressed as racial minorities in the United States?" Anxiety overtook me as I realized that my identity as a member of a protected class was relevant to my selection as a Truman Scholar. My nervous voice broke the piercing silence of the room when I said that arguing over which marginalized group is more oppressed is counterproductive to both parties, and all other oppressed groups. A palpable tension filled the room at this point, with some panelists appearing to be fine with Kevin Higgins questions and others showing consternation from such questions.

Following this, most of the questions were asked in a respectful manner, but I responded nervously, stuttering through answers that were still substantive. Serious questions continued until the second-to-last question, asked by Holly Teliska, who stated "You present a very logical career path. However, at the end of your application, you state that you wish to run for elected office. This is absurd. Elected officials need to know about local issues, like schools. How do

you justify running for elected office when you are unequivocally unqualified?" As I anxiously provided a stuttering response, Brooks Allen's smirks turned to a discernable laugh.

For the last question on if I had anything else to share, I stuttered significantly as I explained I did not feel that the questions in the interview allowed me to convey three main points about my candidacy, which the Truman Foundation recommends that interviewees attempt to convey in their interviews. As I stuttered through a response, a smirk on Brooks Allen's face grew into laughter again, this time joined by Holly Teliska and Kevin Higgins.

I have relayed this interview experience to numerous individuals since March 18, all of whom have been surprised if not shocked by the manner in which I was treated by the Truman Foundation's interview panel. This surprise started when I returned to the interviewee waiting room and the other candidates asked how my interview went. I responded that it was a horrible experience, explaining that the panelists attempted to elicit an emotional response and upset me throughout the interview. A few of the other interviewees attempted to comfort me by explaining that candidates who are under significant consideration are typically given challenging interviews. Later, in a conversation with a few other finalists, I reiterated some of the questions I was asked. Particularly, everyone found the question about me getting off a plane in Macedonia and saying "you're empowered" to young people absurdly humorous, inappropriate, and unlike any of the questions other panelist were asked.

Communicating with my fellowships' coordinator shortly after the interview, she found the experience absurd. In conversation with my school's Truman Scholarship advisor and Dean of Faculty, he described the experience as a charade and was astonished interview panelists acted in the manner which they did.

USA000013

STIP000004

What is most strange about this experience is that I was the only interviewee who reported being treated in this manner. Most of the other interviewees reported being treated in the same manner as the first interviewee, with respect and dignity from the entire panel. Some interviewees mentioned being asked intellectually challenging questions, but not emotionally upsetting or degrading questions. Astonishingly, the interviewees who were awarded the scholarship reported having easy interviews.

**Comparing Merits:**

The Truman Foundation has previously stated that my application was reviewed as "generally positive," but that the foundation demands scholars' merits be "much higher than generally positive." This claim is clearly unsubstantiated when juxtaposed with the Truman Foundations' criteria for scholarship acceptance and the merits of other scholars selected both nationwide and in California.

Regarding the "generally positive" comment, an objective analysis would demonstrate that my merits meet the qualifications for scholarship acceptance, as demonstrated by the acceptance of Wanjiku Gatheru and Catherine Cartier, who hold strikingly similar qualifications as me.

As for the California selection, this claim is so ridiculous that any objective person would be able to compare my qualifications in the field of international development to those selected to pursue degrees in international development and question the legitimacy of the selection. In fact, given the stark differences in socio-economic class between myself and those selected, the selection appears to may involve nepotism.

**Conclusion:**

USA000014
STIP000005

Given that I had differential treatment from the other finalists, am a member of multiple protected classes that were overtly shown in my application, and have greater qualifications in the field of international development than the selected finalists to pursue degrees in international development, it is appropriate that I ask the Truman Foundation to investigate these circumstances and, if it is found that considerations outside of my merits were taken into account in the selection process, the Truman Foundation work to ameliorate the harm that has been caused. This memo has provided a concrete case for prima facie discrimination and a well-substantiated argument for direct discrimination. The Truman Foundation needs to appoint an impartial, external entity to investigate this and be open to remedying it.

Up until this point, the Truman Foundation has ignored my emails, did not impartially investigate my case, and has attempted to cover up malfeasance by interview panelists. While it is in the best interest of all parties for this matter to be resolved between me and the Truman Foundation, the Truman Foundation does not appear to be motivated by the concerns raised. If I do not hear from your organization by 17:00 EST on Wednesday, July 17, I will take such lack of communication as a failure to investigate discrimination and will fully utilize external methods to bring justice to the manner your organization has treated me.

Best Regards,

*Brendan Schultz*

Brendan Schultz