Case No.  3:20-cv-04058-MMC_____
DEFT Exhibit No. _____H_____
Date Admitted _____
Signature _____

| | |
|---|---|
| **From:** | Dr. Terry Babcock-Lumish |
| **To:** | brendan.schultz1@gmail.com |
| **Cc:** | Tara Yglesias; office |
| **Subject:** | Re: 2019 Truman Scholarship selection concerns |
| **Date:** | Friday, September 6, 2019 12:23:15 PM |

Dear Mr. Schultz,

My colleagues and I take concerns about discrimination very seriously. We, likewise, take very seriously our mission to invest in our nation's next generation of public service leaders. You participated in our annual selection process and unfortunately were not successful in being named a 2019 Truman Scholar.

Upon arriving at the Foundation, I learned of your concerns and followed our stated protocol. Our investigation was carried out with discretion, with only our office staff, former Executive Secretary, Dr. Andrew Rich, and the Secretary of your selection panel, Mr. Brooks Allen, being made aware of your identity.  We assessed your claims; however, as previously stated, none of them rose to the level of discrimination. As described in our earlier correspondence, we did make adjustments to our annual selection process, in part based on the information you provided. We communicated our findings to you in detail.

But according to your email, it appears that you find our earnest efforts to be insufficient. I am unsure what more we can do, and your email does not provide additional information to bolster your claim of discrimination. The process that we outlined previously requires that we now pass this investigation to our outside legal counsel. You need not do anything further, we will forward all the materials we have to him. His review will take some time.

While this has likely been a disappointing outcome for you, we appreciate your willingness to express your concerns and wish you well in your path in public service.

Thank you,
Dr. Terry Babcock-Lumish

_____

**From:** Brendan Schultz <brendan.schultz1@gmail.com>

USA000024

STIP000017

**Sent:** Tuesday, September 3, 2019 4:24 PM
**To:** Dr. Terry Babcock-Lumish <terrybl@truman.gov>
**Cc:** Tara Yglesias <tyglesias@truman.gov>; office <office@truman.gov>
**Subject:** Re: 2019 Truman Scholarship selection concerns

Hello Dr. Babcock-Lumish,

I hope that you had a pleasant Labor Day Weekend.

Thank you for your response and your candor. I would like to respond
to a few points in your argument surrounding the interview and
selection. I will first point out some mischaracterizations about my
candidacy and then outline the problems with the Truman Foundation's
response to this issue.

-       The Ethos of My Interview Versus the Ethos of a Standard
Truman Scholarship Interview – If your claims about interview
panelists wanting to put interview candidates under extensive
emotional pressure were accurate, it could be expected that all
candidates, including selected candidates, would have undergone such
experience. I have already stated that those selected did not report
being placed under emotional pressure, or even intellectual pressure
for that matter. Moreover, in conversations I have had with other
Truman Scholars from different jurisdictions, none of them had an
interview experience similar to mine, where select panelists
emotionally attacked a candidate. Surprisingly, I have yet to find a
person who underwent an interview panel where particular panelists
consistently attempted to emotionally challenge a candidate, like
panelists attempted to do in my interview.

It is important to note that there are significant differences between
intellectually challenging an applicant and emotionally hazing an
applicant. In my case, the interview panelists did the latter.
However, your response leaves the reader thinking that the atmosphere
of the room was inquisitive and intellectually challenging by
mischaracterizing the ethos of the room and conveniently leaving out
important details of the interview that demonstrate malice on the part
of some interview panelists. I have taken part in a variety of

USA000025

STIP000018

interviews where interviewers sought to intellectually challenge me, have me explain my motivations, and critique my international development work. Never once have I been laughed at in an interview or had my ethnoreligious identity used as a rebuke to a question, as was the case in my Truman Scholarship interview. Moreover, I was well aware that Truman Scholarship interviews are designed to be intellectually challenging before I stepped into the interview room, contrary to what you state in your letter.

The events that took place were not an interview for a competitive fellowship, but a discriminatory charade. You claim in your response that if interview panelists feel a candidate is unable to handle the pressure of a confrontational interview, they will not pose as challenging of questions. Mr. Higgins, Mr. Allen, and Ms. Teliska did the opposite. When they saw me having emotional issues, they continued hazing – and took pleasure in it. It is important to note that these instances were not acknowledged or addressed in your letter.

-       Appropriateness of Questions on my Jewishness – Insofar as your argument that it is appropriate for panelists to ask questions about any aspect of a student's application, including an applicant's ethnoreligious identity, this would arguably be acceptable if this applied to candidates of all ethnoreligious identities. However, during the California interview, this policy appeared to only apply to Jews. No other applicants but Jews were asked anything about their ethnoreligious identity, despite other candidates holding ethnoreligious identities that were important to their work. When Jews have to justify their motivations and ethical compass and others do not, it's antisemitism.

It is also important to note that the Chair's question relating to my ethnoreligious identity was in response to me giving a reasonable answer to a ridiculous question he presented, which appeared to aggravate him. If the first response to a person when insulted is to bring up the identity another person holds, this displays a pejorative attitude against that group. When this is directed against a person of a protected class, it is a civil rights violation. Mr. Higgins' question had nothing to do with the values emanating from my

ethnoreligious identity or how my positionality as a secular Jew factors into my work in Macedonia and in my community in the United States, which is how my Jewishness was presented in my application. Instead, his questions on my ethnoreligious identity worked to question the marginalization that Jews face and have me justify my experience of being a Jew. The question was irrelevant to my consideration for a Truman Scholarship and, given its occurrence in the interview, demonstrates that Mr. Higgins was not a fair arbiter in the selection process.

-       Comparing Merits – Even if we had large disagreements on the circumstances of the interview, the merits of the candidates and the selection criteria for the Truman Scholarship are largely open information. A comparison of merits is made easy by the fact that the two selectees and I were the only finalists in California applying for degrees and pursuing careers in international development. The discrepancies between each candidate's merit in the field of international development and the outcome of the selection are easily recognized by any impartial observer. One of the selectees has no applied experience in international development and the other has marginal experience in international development. These experiences compare to a candidate who represented the United States to Macedonia in high school on a State Department scholarship; taught English in Palestine; returned to Macedonia to start an international organization that now has a six-figure budget; led the design and implementation of multiple youth development programs; received grants from organizations like the State Department to implement such programs (as the only college student in the US to receive such grants), and is regularly invited to State Department conferences and other international gatherings to present his work. This international development experience is in addition to extensive on-campus leadership and graduating with honors in three years. Moreover, three YES Abroad alumni applied for the Truman Scholarship in 2019. Only one of them has continued doing work in his YES placement country after his exchange – and he is the only one who was rejected by Truman. The other two women were awarded scholarships. This, in combination with the other circumstances surrounding the California selection, is a strange coincidence. Moreover, as I mention below, your organization's

USA000027

STIP000020

view of my merits has changed significantly since my initial
communication with Ms. Yglesias.

-       Possible Nepotism – As for your response to my charge of
nepotism, you claim that you are "not aware of any allegation of these
students being known to or related to anyone associated with the
selection process." I made an allegation of nepotism, so your claim is
not true. If merit is taken into consideration, and there is no
discrimination as you claim, the only factor that can explain this
situation is corrupt outside influence. Your one-sentence dismissive
remark to my allegation and lack of investigation to that allegation
are both concerning.

I would also like to discuss some problems with your organization's
response to this matter.

-       No Punctuality – It is important to note that your
correspondence, while respectful and illuminating me to your point of
view, was sent nearly five months after my interview. Before July 11,
your organization attempted to obfuscate the situation, only
responding to my emails when I explained that I was willing to pursue
external avenues to bring justice to this situation. At best, this is
bad faith and an abdication of responsibility. At worst, it is an
attempt to cover-up malfeasance by interview panelists.

-       No Equal Opportunity Policy or Civil Rights Grievance
Procedures – I have still yet to receive a copy of your organization's
civil rights grievance procedures. At first, I was informed by Ms.
Yglesias that the equal opportunity policy on the Truman Foundation's
website does not apply to candidates, which directly contradicts the
equal opportunity page on your website. I was then informed that the
only written process is contained in the job description for the
Deputy Executive Secretary, which was never sent to me. Moreover, if
the Truman Foundation's only semblance of civil rights grievance
policies is located in the job description of the Deputy Executive
Secretary, that is problematic for a variety of reasons.

-       No Impartial Investigation – From the communication I have

USA000028

STIP000021

exchanged with employees of the Truman Foundation, it appears that there was no standard process for investigating an alleged civil rights violation. Ms. Yglesias stated in her July 13 email that you would be handling the investigation, claiming that you were impartial. Reading your letter, it appears that Ms. Yglesias handled much of the investigation. Moreover, you, through presenting an altered version of events in the interview, have demonstrated that you do not have the ability to impartially investigate and resolve this matter.

-       No Clear Argument – It is also important to realize that the Truman Foundation's line of argument has changed between the interview, the initial set of emails, and now. The panel found my career trajectory (aside from political ambitions) as explained in questions twelve and thirteen, to be a logical extension of my current work and educational plan during the interview. Apparently, now there is "weakness" in my career plans. Moreover, Ms. Yglesias initially stated that my merits did not meet the criteria of being selected as a Truman Scholar, describing the review of my application as "generally positive." From your letter, it appears that the view of the Truman Foundation now is that I was a qualified candidate, but other candidates were more qualified. It has been five months, and the Truman Foundation still cannot seem to present a clear rationale for why I was not selected and for why my interview was conducted in a manner different from other candidates. Your response, while kindly worded, continues this obfuscation of reality by presenting an unclear argument with no solid premises.

Overall, the response of the Truman Foundation to this matter has been an elongated, obfuscated attempt to rationalize differential treatment based on protected characteristics. Your organization's actions are a clear violation of federal civil rights protections. It would be far easier for the Truman Foundation, the interview panelists, selectees, you, your staff, and everyone else implicated by this if we worked to reach a voluntary resolution instead of using external means. Moving forward, I do plan on initiating an external review of these circumstances. Unless your organization has another avenue to settle this, I see our attempt to reach a bilateral resolution on this matter as over.

USA000029

STIP000022

From the sincerity of your response, I wish that you were on the
California interview panel. Unlike the other panelists, I am confident
you would have protested when the Chair and Secretary of the panel
decided to turn the interview into a discriminatory, demeaning
charade. Despite this sincerity, the actions of the Truman Foundation
and its agents constitute a violation of my civil rights and your
decision to not respond appropriately furthers the antisemitism that
occupied the interview room on the day of the California Truman
Scholarship interviews.

All this being said, I would like to request five items before moving forward:

1.    If it exists, a copy of the Truman Foundation's equal
opportunity policy for applicants, on the organization's letterhead.
2.    An explanation of how my identity has been handled up until
this point, with the names of all those who my identity has been
released to, as part of your and Ms. Yglesias' inquiries.
3.    A list with states and years (no names necessary) of the
interviews you have participated in or know of where interview
panelists laughed at a candidate.
4.    A link or file for the meeting minutes where the Board of the
Truman Foundation or another entity within the Truman Foundation
discussed consistent, one-sided gender disparities in the selection as
well as with applicants.
5.    You to confirm in writing, after contacting Ms. Yglesias and
the former Executive Secretary, that there was no external influence
or actions that could be described as nepotism or cronyism in the 2019
selection of the California Truman Scholars.

It is reasonable for me to receive this information by the end of this week.

Wishing You a Pleasant Start to Your Week,

Brendan Schultz

On Wed, Aug 14, 2019 at 11:28 PM Dr. Terry Babcock-Lumish
<terrybl@truman.gov> wrote:

USA000030

STIP000023

>

> Dear Mr. Schultz:

>

>

>

> Thank you for your email of July 11, 2019.  First, allow me to apologize for the delay in responding to you.  All of us at the Harry S. Truman Scholarship Foundation take our shared responsibility as the memorial to President Truman very seriously. A lack of communication should never be interpreted as a lack of interest in Americans making commitments to careers in public service. Unfortunately, your email arrived during a time of transition at the Truman Foundation, such that the staff remaining was not able to fully address your concerns.

>

>

>

> The Foundation was distressed by the information contained in your July 11 email.  In keeping with Foundation protocol, Ms. Yglesias investigated what happened during your interview in San Francisco in order to provide a full account for my consideration.  Given the paramount importance of our annual selection and as someone who has been involved in our annual process since 2003, I can assure you that I approached this matter objectively.  As Executive Secretary, my first responsibility is to ensure our selection process remains free of bias, and I am perfectly willing to sever personal or professional relationships to ensure an equitable selection process.

>

>

>

> To fully understand what occurred during your interview, I thoroughly reviewed your materials, including your application, letters, transcript, and email correspondence.  I also reviewed the materials of the other candidates who interviewed with you, and Ms. Yglesias provided thorough accounts of her investigation, including lengthy discussions with some members of your interview panel, Ms. Sandy Hamilton, and other Faculty Representatives.

>

>

>

> It seems that this situation can be distilled into two main areas:  first, the issues raised by your interview experience, and second, your comments regarding bias in our selection process.  I will discuss each of these areas in turn.

>

>

>

> Before discussing what occurred during your interview, I want you to be aware of two items.  First, I relied on your notes as the primary resource for what transpired on that day.  Panelists were consulted in our attempt to verify your information, but I trust that your recollection of the day is more detailed.  Second, I will be disclosing information that is generally not shared with Scholars, Finalists, or Faculty Representatives.  We do not routinely provide feedback on the interviews, nor do we ever disclose panel deliberations.  However, I feel that your allegations are serious and deserve the respect of a full explanation.

>

>

>

> You note that upon entering your interview room that the faces around the table were stoic and that the panelists did not respond to your greeting.  There was an issue that, while unrelated to you, likely affected the atmosphere in the interview room.  I am hoping that you did not allow that atmosphere to affect your performance, perception, or confidence, but I can understand that walking into an unpleasant atmosphere might be unnerving.

>

>

>

> Your interview was indeed confrontational and focused on issues surrounding your work in Macedonia and the role of your faith in your work.  You were asked to defend your position on a number of sensitive issues and were given questions of an emotionally-charged nature.  While I can appreciate why the interview was upsetting for you, I do not believe that you were questioned in this way because the panel was biased against you.  To the contrary, panelists read each application with considerable care and prepare accordingly. Rigorous interviews are frequently what allow finalists to present their ideas and efforts most effectively and persuasively.  I can appreciate that rigorous questioning may sometimes feel antagonistic – something I will address later in this letter.

>

>

>

> Frankly, the first question that you were given - why work in Macedonia over the United States? - is one that has been asked in some form at many Truman panels over many years.  The question is never posed because we believe one is "better" than the other; rather, the question is asked because we must fully understand why an applicant is passionate about a given issue, community, geography, etc.  You were given three opportunities to respond to the question in a detailed way.

>

>

>

> If I were present at your interview, I am not sure I would have been satisfied by your initial response

to this question.  Simply having more opportunities in one country sells short your passion for both the region and the issue of humanitarian response and development.  Mr. Allen provided you the opportunity to expand on your commitment to Macedonia and thus keep yourself competitive.  I am not sure I would have given you the same grace.

>

>

>

> As for Mr. Higgins' question, I suspect he was actively seeking a level of detail missing from your application.  Much of your material hinges on your experience in Macedonia.  In order for us to award the Truman Scholarship, a selection panel must thoroughly understand what you did and how that compares to students with similarly impressive experiences but greater breadth of experience.  I do not agree with the way the question was posed or with the irreverence, but I see no evidence of discrimination.

>

>

>

> Panelists are told that they may ask about any of the items candidates discuss in their application. Ms. Yglesias is well known for her transparency in her communication with Faculty Representatives across the hundreds of colleges and universities that nominate promising Truman candidates each year, and likewise communicates this very point.  Understanding a student's motivation or drive can be invaluable, so we encourage applicants to help us understand not simply what they do, but also why.

>

>

>

> You reference your faith in the application several times and indicate that it plays a role in both your personal philosophy of service, as well as your specific interest in Macedonia.  Consequently, I am unsurprised you were asked about this interplay.  The questions, while inelegant, were not intended as a litmus test of your faith, but rather, as an opportunity for you to communicate what animates you.  It is also unsurprising that you were asked questions regarding your desire to run for office in the United States when it appeared from your application that you were unlikely to work in-country for significant periods of time. As Truman Scholars take a diversity of paths in public service, there is no "correct" answer to this. Again, as the Truman Foundation's "investment committee," interviewers aim to understand the motivation, logic, and ultimate aspirations of the Finalists they meet.

>

>

>

> In many ways, your Truman interview was entirely typical of Truman interviews. Twenty minutes goes very quickly. During this time, panelists ask a variety of questions, often challenging, if not

confrontational, to ascertain how the candidates rank relative to one another for leadership potential, intellectual strength, and the likelihood of making a difference in public service. Frequently, the panelists ask hypothetical questions that do not necessarily reveal panelists' views but give the candidate a chance to do well with hard, sometimes emotionally-laden, questions. From my own experience, as both a Truman Scholar and a panelist, what separates a good candidate from a Truman Scholar is the ability to deal with antagonistic questions.  The rationale for this approach is that a life of public service can often be brutal – emotionally, physically, and financially – and the best Truman Scholars are individuals best able to manage adversity.

>

>

>

> To this end, panelists are instructed to be provocative – unless they feel a candidate is unable to handle the pressure of a confrontational interview (and thus are unlikely to be selected).  Those selected as Scholars – including those with whom you spoke – often report that the interview seemed easier than expected.  That is likely because those candidates engaged in a vigorous give-and-take are frequently successful.  While I might personally have used a different tone, I cannot say that any of the questions that you shared were unduly confrontational.  The panel's continued effort to engage you in a rigorous discussion suggests they thought you could respond well to the questions and rise to the challenge.

>

>

>

> Ultimately, the decision to select other candidates was made based on the committee's determination that they presented the best overall combination of written material and interview performance.  Upon review of your materials, I can discern weaknesses (most notably your responses to questions 7, 12, and 13) that were not present in other applications.  Recollections of your interview shared with Ms. Yglesias revealed that while it was generally positive, the panel felt that you were lacking in detail in some of your responses, in addition to motivations for your work.  These are extremely minor criticisms that should not preclude you from having a successful life and career in public service. Nonetheless, in the very competitive world of prestigious scholarship and fellowships, such little things make the difference.

>

>

>

> I realize that this long explanation, coupled with the news that you were extremely close to being a Truman Scholar, is cold comfort given what you felt during and after your interview.  To the extent that you were not fully aware of the confrontational and sometimes personal nature of the Truman interview, you have my profound apology.  I am likewise sorry that you felt personally offended by questions that I truly believe were designed only to be provocative and allow you to show your mettle.

But there is a line where rigor can feel like confrontation, and it appears that you feel that line was crossed here.  That sense of disrespect, while likely profound, does not rise to the level of discrimination.

>

>

>

> I do believe you raised very important issues in your email to which the Foundation must be sensitive.  For this, I thank you. As the new Executive Secretary, I am currently reviewing all aspects of our annual selection to ensure our process is free of bias, efficient, and worthwhile to all participants. While discussing this matter with Ms. Yglesias, she noted that even if you were not treated in a discriminatory way, you likely felt you were treated in a disrespectful way.  Based on that assessment, we are considering adjusting the size and membership of not only the San Francisco panel, but all panels, to ensure Finalists meaningful and respectful interview experiences.  We are using your information and suggestions to shape our discussion as we move forward. While our selection will remain vigorous and challenging, be assured that we will do our best to see that no other Finalists leave their interviews feeling as you did.

>

>

>

> With respect to your discussion of merit, you are correct that many people who "qualify" for a Truman Scholarship are ultimately not selected.  Our stated criteria include leadership, public service experience, and academic success.  Each year we are forced to pass by a number of students who meet those criteria because we are constrained by both our budget, as well as our requirement for state-based selection.  California, for instance, is allotted one scholarship even though the state is huge.  Last year we had the budget for two Scholars, but no more.  We select the person who best meets our criteria - and in cases where multiple individuals meet or exceed the criteria, we must make fine distinctions based on the materials presented to us.

>

>

>

> These materials – what enabled us to select other students as Scholars – are admittedly not available to you.  Likewise, you are not able to see that the reason we tend to have more women selected as Truman Scholars (an issue raised in your emails) is that we have a much higher proportion of women applying and being nominated for our Scholarship.  As for your charge of nepotism – I am not aware of any allegation of these students being known to or related to anyone associated with the selection process.  I also do not see a prima facie case for discrimination from the material you provided. Rather, I see someone who was well qualified, but ultimately not selected, because others presented themselves in both writing and in person as better fits for our organization and its mission.

USA000035

STIP000028

>

>

>

> You have made your university and the Truman Foundation proud – for being a wonderful Finalist, providing honest feedback, and standing up when you felt an injustice occurred.  One of the great disappointments of our work is that we cannot claim every change agent as a Truman Scholar – although we might wish we could.  Upon receiving an unprecedented 840 applications in 2019 and identifying only 199 finalists, you should feel proud to list "Truman finalist" on your resume moving forward. I hope that you use this experience to inform and inspire your future – and I sincerely hope that you do everything you can to make us regret our difficult decision not to select you as a Truman Scholar for the class of 2019.

>

>

>

> The Foundation wishes you all the best in your life and career in public service.

>

>

>

> Sincerely,

>

>

> Terry Babcock Lumish

>

>

> --

> Dr. Terry Babcock-Lumish

> Executive Secretary

>

> Harry S. Truman Scholarship Foundation

>

> 712 Jackson Place, NW

>

> Washington, DC 20006

>

>

> TerryBL@truman.gov

>

> www.truman.gov

USA000036

STIP000029

>

>

> Please consider the environment before printing this email.

>

USA000037

STIP000030